OLE C. SORENSON, APPELLEE, V. LINCOLN TRACTION COMPANY, APPELLANT.

FILED JUNE 16, 1913.  No. 17,294.

1. Carriers: EJECTION OF PASSENGER. It is the duty of the conductor and employees of the company in charge of a street car to maintain order and protect the passengers from insult and annoying disturbances such as loud talking; swearing and singing of boisterous and improper songs in the car. If a passenger refuses to refrain from such conduct, the conductor may remove him from the car, and may use such reasonable force as is necessary for that purpose.

2. ———: ———: PREJUDICIAL INSTRUCTIONS. Instructions quoted in the opinion are held to be misleading and prejudicial under the issues and evidence in this case.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. Reversed.

C. S. Allen and O. B. Clark, for appellant.

Wilmer B. Comstock, contra.

SEDGWICK, J.

The plaintiff alleged in his petition that he was a passenger on one of the cars of the defendant company from

the city of Havelock to the city of Lincoln, and that the employees in charge of the car, "under guise and pretense of preserving order and without any provocation, assaulted plaintiff with a club and controller with which the car was operated." He demanded damages for the injuries so sustained. The defendant answered that the plaintiff was boisterous and offensive to the other passengers and that he was in a state of intoxication; "that, in the discharge of their duties to preserve order and protect passengers from annoyance, the servants of the defendant requested the plaintiff to desist, whereupon he became more offensive and committed an assault upon them; that in resisting the assault and in enforcing order the servants used only reasonable force and no more than was necessary." There was a verdict and judgment in favor of the plaintiff, and defendant has appealed.

It appears that the car was crowded with passengers; that the plaintiff was employed in the Havelock car shops; and that he and a considerable number of his fellow employees were standing together in the rear end of the car. The plaintiff testified in his own behalf, and also called five of his fellow employees in the car shop, all of whom testified that they did not consider the plaintiff intoxicated at the time. The plaintiff and some of his witnesses testified that he drank two glasses of beer before he took the car that evening. One of these witnesses testified that the plaintiff "was conducting himself as a gentleman and making no disturbance; that the conductor came, and, after some words, pulled a black jack out of his pocket and struck him; that he pulled the bell and the motorman came running in and also hit him with the controller. Plaintiff made no effort to strike either of them, but merely attempted to protect himself." These witnesses vary somewhat in their version of the circumstances and language used between the plaintiff and the men in charge of the car at the commencement of the disturbance. James Dalton, a machine apprentice, also testified for the plaintiff and in some respects corroborated these other wit-

nesses.  One Doran, who was not on the car at the time, testified for the plaintiff that he saw him at supper time and he appeared to be sober; he saw him again at 10 o'clock that night and he was sober at that time.

The question for the jury to determine was whether the circumstances and the plaintiff's conduct at the time were such as to lead a reasonably prudent man, situated as the conductor was, to believe that it was necessary to do what he did in the interest of the passengers and to preserve the peace, and that he acted with reasonable prudence under the circumstances or whether the conductor unjustifiably assaulted the plaintiff.  It was in the interest of the passengers on the car that any public disturbance should be prevented and that they should be protected from annoyance and insult, and, on the other hand, that the passengers should not be unnecessarily or unreasonably assaulted by the employees of the company.  The passengers then would be presumed to be disinterested witnesses in the case.

Mrs. Allen was a passenger on the car and was accompanied by a young girl.  She testified, among other things, that they "went up to the front end of the car.  We concluded that was the best place after seeing the conditions in the car.  We were obliged to go to the city.  We keep student boarders, and there were some things we could not get at University Place.  We intended to wait until the drunk cars were gone.  The car went by that we supposed was the regular drunk, as it was known in 'Uni.,' so we said, 'We will have to take this car, the next one will be too late to get into the stores.'  The platform was full of men.  I got my way through, but my daughter attempted to get on and the bell rang and she fell. * * * After we had gone a ways there was so much noise, talking, swearing and some singing, and all the time the car kept stopping for quite a ways.  I wondered why it was.  Finally I watched and there were some men around the stove, and I noticed one reach up and pull the bell.  I spoke to my daughter and said, 'They are pulling the bell.'

I kept seeing the motorman look back, and I thought there might be something wrong with the car. I looked over the car, and my daughter said, 'Let's get off—I did not want to go—let us get something, whatever we can, for dinner.' I said, 'No, we will be up here by the motorman, we can jump off if anything happens.' They were so noisy, we were afraid of something. I saw the conductor. I was so far in front I could not understand what he said, but I think he asked them to quit pulling the bell rope. And then I saw the conductor, I think he went to him two or three times out there, and said something to them, but it didn't make any difference. And one passenger that sat opposite me said, 'There will be a racket, a row, but we will see fair play.' Of course then I didn't know what they were doing with the conductor; they were surrounding him, but I saw the conductor go back. * * * Some of the passengers sat with their mouths open; some were so intoxicated, they could not sit up straight. There was a good deal of noise and profane language and singing. * * * I saw the plaintiff grappling with the conductor. The three of them had hold of him. I thought all three were after the conductor. That's the way it looked to me."

The young girl testified: "The seats were full, most of them with drunken men. Noticed that the car kept stopping all the while. Thought there was something wrong, glanced back. I did not see any one pulling the bell cord, but heard the bell ring a number of times. * * * They had been singing most of the time, singing songs that were not fit to be sung in a place of that kind. I glanced back and saw this man strike the conductor. Looked around again and saw that they were fighting. Mortorman kept looking back to see what the trouble was. He took the crank of the street car that he had in his hand. I remember seeing him go by me, as I was standing leaning against the seat, just as he got to this man. * * * It was very noisy and there was profane language. Came from parties standing around the stove. I saw the man at the stove

strike the conductor.  Conductor struck in protection of himself.  Think the passenger struck the conductor with his fist.  Saw nothing in conductor's hand."  Several of the passengers testified in the case and their testimony was generally corroborative of that of these two ladies.

The conductor testified: "Plaintiff's conduct attracted my attention.  He was talking with two companions, very loud, and swearing, and raising quite a disturbance.  I went up to him and told him that the noise would have to be stopped, and the swearing.  Said he hadn't done anything but what he would do again, and defied me to stop him, and swore.  Stopped the car and asked him to get off. I took hold of his arm and he struck at me.  After he struck at me I struck back at him.  Motorman came in. I don't know whether he hit anybody or not; I could not see.  There was quite a jam."

The court instructed the jury: "(7) The undisputed evidence in this case shows that the plaintiff was a passenger upon defendant's car.  It was therefore the duty of the defendant to use a high degree of care and diligence to protect plaintiff from injury, and to convey plaintiff safely and properly from Havelock to his destination in the city of Lincoln.  If the defendant entrusts this duty to its servants, the law holds it responsible for the manner in which those servants discharge such duty, and the defendant is responsible for any malicious or wanton acts of its motorman or conductor, or either of them, against or upon the plaintiff during the course of the discharge of their duty to the defendant, which relates to the plaintiff, and if its servants, instead of protecting the plaintiff, assaulted and beat him without just cause, as hereinafter explained, then the defendant has failed in its duty to the plaintiff and is answerable to him for whatever injury he has sustained by such assault.

"(8) On the other hand, if you find from the evidence that the plaintiff was boisterous, unseemly and offensive to the other passengers riding in the car, then defendant's conductor not only had the right, but it was his duty to

the other passengers, to require plaintiff to desist in his boisterous and offensive conduct, even to the extent of requiring plaintiff to leave the car in the event that he still persisted therein."

It would seem that under this evidence the jury must have been misled by these instructions. The instructions do not seem to be exactly adapted to the evidence. The jury is told that it was the duty of the defendant to use a high degree of care and diligence to protect plaintiff from injury and to convey him safely and properly from Havelock to his destination in the city of Lincoln. This would be true so far as the ordinary duty of the defendant to its passengers is concerned, but it does not appear to have in view the question as to whether the conduct of the plaintiff was such as to make it the duty of the conductor to remove him from the car. In the following instruction the jury are told that, if the conduct of this plaintiff was boisterous and offensive to other passengers, the conductor had the right and duty to require him to desist, "even to the extent of requiring plaintiff to leave the car in the event that he still persisted therein." This does not appear to recognize the right of the conductor to use such force as was reasonably necessary under such circumstances to remove the plaintiff from the car. He might require the plaintiff to leave the car, but there is no light given the jury as to the right or duty of the conductor in case the plaintiff refused to leave. The instruction is followed immediately by another to the effect that words of provocation alone will not justify an assault, "except in so far as the assault consisted in attempting to put the plaintiff off the car." This language does not seem to remedy the failure to explain to the jury the duty of the conductor under such circumstances. The jury is nowhere directly told under what circumstances it would be the duty of the conductor to remove the plaintiff from the car. The tenth instruction is as follows: "While one may resist any unlawful attempt to injure his person, he must not in resisting an assault in that regard exceed the bounds

of necessary defense and protection, for it is only permitted as a means to avert an impending evil, which might otherwise overwhelm the party, and not as a punishment or retaliation for the injurious attempt. The degree of force necessary to repel an assault will naturally depend upon and be proportioned to the violence of the assault, but with this limitation any degree is justifiable. Excessive violence, even if called into play in the first instance, in self-defense, must be answered for in damages."

It seems that by the instructions the case was submitted as a quarrel resulting in an assault, and the question is put to the jury whether the assault by the conductor and motorman was justifiable as being in self-defense, whereas the real issue was whether the conductor and motorman were in the line of duty in protecting the passengers against the misconduct of the plaintiff and his companions and in attempting to remove plaintiff from the car, and, if they were, whether they used more violence than appeared to be reasonably necessary under the circumstances. The jury might have believed under this evidence that the plaintiff and his companions were noisy and boisterous and disregarded the rights of the other passengers entirely, or so much so that it became the duty of the conductor to take some action to preserve decent order, and they might have supposed, under these instructions, that the conductor was not justified in using force to eject the plaintiff from the car. From the condition of the evidence and the instructions, it seems clear that the jury must have been misled in regard to the real issue that they were required to pass upon.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

ROSE, J., dissents.

FAWCETT, J., not sitting.